IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TOBY D. WILCOX,**

      **Petitioner,**

v.

**PHILLIP KERNS, Warden,**

      **Respondent.**

**CASE NO. 2:08-cv-318**
**JUDGE FROST**
**MAGISTRATE JUDGE ABEL**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on the instant petition, respondent's return of writ, petitioner's traverse, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED** as barred by the one-year statute of limitations under 28 U.S.C. §2244(d).

## FACTS and PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> On March 22, 2004, defendant was indicted on six counts of aggravated murder with death penalty and firearm specifications, one count of attempted aggravated murder, two counts of kidnapping with firearm specifications, one count of aggravated burglary with a firearm specification, and one count of aggravated robbery with a firearm specification. It was alleged that the offenses occurred on or about May 29, 2003, and the charges arose from the shooting deaths of Habu Westbrook and Alamar Wright.
>
> In August 2005, the case proceeded to trial. As pertinent to this

appeal, the state's evidence at trial was as follows.

On May 29, 2003, Columbus Police Sergeant Jay Hammer was on routine patrol when he was dispatched to 1456 North 5th Street, Apartment B, in response to an alleged robbery-in-progress. As he was en route to the scene, there was a report that shots had been fired. Once he arrived at the intersection of 9th Avenue and 5th Street, a crowd of people directed him to the apartment. As he climbed to the second floor, he noticed blood on the steps. At the landing on the second floor, he saw a pool of blood outside the closed door of the apartment. With his gun drawn, he knocked on the door but initially received no response. Just as he was about to kick the door open, Amie Wright slowly opened the door. Ms. Wright had blood on her shirt and was hysterical. Sergeant Hammer entered the apartment and found the motionless body of a man, later identified as Habu Westbrook, who was bleeding from the top of his head. He also saw a small baby, who was later identified as Alamar Wright, on a bed in the back of the apartment. Once he got closer to the baby, he could see a big gunshot wound to his forehead. He proceeded to direct other officers in securing the scene.

Columbus Police Detective William Snyder, who was assigned to the Crime Scene Search Unit, worked with two other detectives in processing the crime scene, which included the outside street, some cars, the apartment building, the upstairs apartment, and a backyard. The detectives photographed the scene and collected possible evidence. At trial, Detective Snyder described photographs of the scene and the evidence collected. When Detective Snyder arrived at the scene, Mr. Westbrook was facedown on the floor. One of the items the police collected from the scene was a blue New York Yankees baseball cap that was found near a pool of blood.

Robert C. Belding, a former deputy coroner in Franklin County, performed autopsies on Mr. Westbrook and Alamar. Dr. Belding determined that Mr. Westbrook had been shot twice. According to Dr. Belding's testimony, one projectile

struck Mr. Westbrook's jaw, upper chest, and neck. That bullet, which shattered Mr. Westbrook's jaw, would have inflicted enough pain to cause him to drop to the floor. Dr. Belding's testimony indicated that the wounds inflicted by that projectile were serious but not lethal. The other projectile struck Mr. Westbrook "a little back at the top of [his] head," traveled downward through his brain, and lodged at the base of his skull near the hyoid bone. (Tr. 196.) The perforation of his skull and brain was the cause of his death. Dr. Belding testified that Alamar was struck by a projectile that entered and exited his skull. The cause of Alamar's death was the perforation of his skull and brain by a gunshot. Alamar was 33 days old when he died.

Ms. Wright testified regarding the circumstances surrounding the deaths of Mr. Westbrook and Alamar. Ms. Wright was engaged to marry Mr. Westbrook, and the two, along with her infant child, Alamar, were living together at the 1456 North 5th Street apartment. Mr. Westbrook supported the household by selling marijuana, and he had three guns in the apartment. Sometime after 9 a.m., on May 29, 2003, Frank Daniels, known as "Touche," arrived at the apartment of Ms. Wright and Mr. Westbrook. Mr. Daniels and Mr. Westbrook had a conversation, and they eventually went outside the apartment. Ms. Wright stayed inside the apartment, and Calvin Wall arrived to see the baby. At some point, Ms. Wright and Mr. Wall exited the apartment, leaving the baby on the bed. Ms. Wright saw Mr. Westbrook sitting on one of their two white Cadillacs, which was parked on 9th Avenue, and Mr. Daniels near the other one that was parked across the street. Mr. Wall crossed 5th Street, and Ms. Wright walked toward Mr. Westbrook. A man approached Mr. Westbrook and indicated that he wanted to buy marijuana. Mr. Westbrook instructed Ms. Wright to get the marijuana. Ms. Wright turned to climb the stairs to the apartment and a man with a gun, later identified as Quan Tatum, came at her. Tatum "snatched" her and told her to "give it up." (Tr. 220.) Tatum fired the gun, and the bullet passed her ear. She fell to the ground, got up, and started to walk backwards up the stairs. She saw the other man, who had asked for the marijuana, pulling Mr. Westbrook into the apartment, as if the man was pointing a gun at him.

Once they were in the apartment, Ms. Wright opened a drawer for Tatum. She backed toward the bed where Alamar was located and told them to leave because her son was there. Mr. Westbrook and the other man were in the kitchen, "tussling." (Tr. 222.) She could hear Mr. Westbrook "hitting up against the stove and the refrigerator." *Id.* He was saying "at Chuckie's house" and was telling them to leave because his girl and his baby were there. (Tr. 222-223.) Ms. Wright heard a gunshot, and she saw Mr. Westbrook "laying face down." (Tr. 223.) She was "no more than ten feet away from him." (Tr. 223.) Because she thought she was going to get shot, she picked up Alamar and tried to go out the front door. She held Alamar with her left hand around his head and balanced him with her right hand. Tatum pointed the gun at her and told her to get away from the door. Tatum reached in her bra, apparently searching for money. At some point, Ms. Wright lost consciousness. Her testimony indicated that Tatum's gun was pointed directly in her face immediately before she passed out. When she regained consciousness, she got up off the floor, and she saw the exit wound in her son's head. She ran outside to get her phone to call 911, and she ran back inside and locked the door until the police arrived. After the police arrived, Mr. Wall returned and told her that she had been shot. She had been shot in her left hand and her chest, where the bullet lodged.

The day after the shootings, Ms. Wright identified Tatum in a photo array as the person who had originally approached her. As to the other assailant, Ms. Wright testified that the person who had approached Mr. Westbrook had brown skin and unbraided hair, was shorter than Tatum but slightly taller than she, and was wearing a "wife beater" and denim shorts. (Tr. 238.) Additionally, she testified that he was wearing a blue New York baseball cap, which he had "pulled * * * down on top of his head." *Id.*

On June 3, 2003, Ms. Wright identified defendant's picture in a photo array as the person who had been with Mr. Westbrook when he was shot. She was not completely sure of the identification at that time because the person in the picture had braided hair and the person at the scene had unbraided hair

4

under a baseball cap. She testified that she told the detective that she was 90 to 100 percent sure of her identification, and that she needed to see him in person to look at his eyes. At trial, Ms. Wright identified defendant as the person who had been with Mr. Westbrook when he was shot. She testified that she was 100 percent sure of that identification.

Frank Daniel, a friend of Mr. Westbrook, testified at trial. He admitted that, in 1994, he had been convicted of drug trafficking. Mr. Daniel first saw Mr. Westbrook round 9 or 9:30 a.m. on May 29, 2003, when he went over to Mr. Westbrook's house. The two went outside, sat on the two white Cadillacs, and smoked marijuana. They also talked with their friend named "Chassie." Mr. Daniel testified that he was aware that Mr. Westbrook sold marijuana, and he also believed he sold crack. Mr. Daniel testified that he saw someone come around the corner and ask Mr. Westbrook for marijuana, and he saw another man grab Ms. Wright as she was going to the apartment. He testified that the person who approached Mr. Westbrook was wearing a blue and white baseball cap, a blue and white jacket, jeans, and a white t-shirt. He saw the person who grabbed Ms. Wright put a gun in her face. That person fired a shot in the direction of Mr. Daniel and Chassie. According to Mr. Daniel, the person with Mr. Westbrook had a gun, and that person said to Mr. Westbrook, "you know what time it is?" (Tr. 284.) Mr. Daniel saw the four go up the steps and into the apartment. He called the police and heard more gunshots after the four had entered the apartment. The police arrived as he was going over to the apartment. On June 4, 2003, Columbus Police Officer Russell Redman showed Mr. Daniel a photo array containing a photo of defendant. Mr. Daniel indicated to the officer that the photo of defendant looked like one of the assailants who had been involved in the incident, but he was not 100 percent certain of the identification without seeing a side view of the person.

Chassie McCrae, who lived in the same area as Mr. Westbrook, went to see him around 9:30 or 10 a.m. on May 29, 2003, because she needed a cigarette. When she arrived at Mr. Westbrook's place, she saw that Touche was also there. Mr.

Westbrook only had two cigarettes left, so he gave money to Ms. McCrae to buy a couple packs of cigarettes from the store. She went to the store, made the purchase, and returned. At some point in time, a man crossed the street and approached Mr. Westbrook. That person talked with Mr. Westbrook. She was unsure what they were talking about, but it was clear to her that the man wanted something. Mr. Westbrook said something to Ms. Wright, and she began to go toward the apartment. Another person came from another direction, pulled out a gun, and fired it at Ms. McCrae. Ms. McCrae ran. After she ran down the street, she turned and saw the assailant who had approached Mr. Westbrook holding a gun to his head. According to Ms. McCrae's testimony, that assailant was wearing a blue hat. She went to the porch of a house where a woman named "Ingrid" lived. She heard more shots. After the police arrived, she saw Ms. Wright, with blood on her, run out of the apartment screaming, "my baby, my baby ." (Tr. 384.) Ms. McCrae testified that she had previously smoked marijuana, but she did not smoke it on the morning of the shootings. When Ms. McCrae was shown a photo array containing defendant's photo, she identified defendant as looking the closest to the assailant that had approached Mr. Westbrook. According to Ms. McCrae's testimony, her identification was uncertain because the person in the photo was not smiling. She earlier had testified that the person who had approached Mr. Westbrook "kept smiling like he was in a good mood or something." (Tr. 385.)

Mark Hardy, a criminalist with the Columbus Division of Police, testified that he examined four spent shell casings recovered from the scene, as well as two spent bullets recovered from Mr. Westbrook's body and one spent bullet recovered from Ms. Wright's body. Mr. Hardy determined that two of the casings had been fired by one gun and that a second weapon had fired the other two casings. Thus, two weapons were involved in firing the recovered casings. As to the spent bullets, Mr. Hardy could not determine whether the two bullets found in Mr. Westbrook's body were fired from the same weapon, but he could not eliminate that possibility. However, he was able to determine that the third bullet, which was recovered from Ms. Wright's body, was not fired from the

same weapon as the other two bullets.

On June 3, 2003, Columbus Police Detective Patrick Dorn obtained oral swabs from defendant for purposes of DNA analysis. On March 12, 2004, Detective Dorn went to Las Vegas, Nevada, after receiving information that defendant had been arrested pursuant to the warrants that were filed for his arrest. Detective Dorn interviewed defendant at a Las Vegas jail. Defendant said he had nothing to do with the homicides. He said he was in the area of the shootings and that he heard shots. He said that, prior to the shootings, he was robbed by Tabari Patterson, who had taken his clothes and ball cap. Defendant said he saw Patterson leave the location of the homicides with his stolen clothes and ball cap.

Debra Lambourne, a DNA analyst for the Columbus Police Crime Laboratory, examined the bloodstained New York Yankees baseball cap that was recovered from the scene of the shootings. For purposes of her analysis, she was also given the oral swab standard of defendant, as well as blood samples from Mr. Westbrook and Alamar. Ms. Lambourne collected swabs of blood from the hat. She also swabbed the hatband in order to collect skin cells. Ms. Lambourne testified that the blood on the hat matched Mr. Westbrook. In addition, Ms. Lambourne opined that, although the cells on the hatband consisted of a mixture from different people, defendant was the major donor to the cells on the hat.

Defendant's expert in DNA analysis, Keith Inman, also examined the baseball cap. Mr. Inman testified that he found the DNA from at least three individuals on the inner linings of the hat. He identified Mr. Westbrook as the major donor, but he agreed with Ms. Lambourne's conclusion that defendant's DNA was on the hat.

At the conclusion of the state's case, the state dismissed four of the five death penalty specifications as to counts four, five, and six in the indictment and requested that the "prior calculation and design" language relating to the death penalty

7

specifications attached to counts one, two, and three of the indictment be eliminated. Aside from those changes, the jury found defendant guilty as charged in the indictment.

A mitigation hearing was held, and the jury recommended that defendant be sentenced to life imprisonment without parole for counts one and four. On August 31, 2005, the trial court entered judgment sentencing defendant to life sentences without parole as to counts one and four, with an additional three consecutive years of prison for the gun specification in count one; ten years in prison as to count seven; ten years in prison as to count nine; ten years in prison as to count ten; and ten years in prison as to count eleven. The court ordered that counts one, four, seven, nine, ten, and eleven shall run consecutive with each other. Additionally, the trial court merged counts two, three, and eight with count one, and merged counts five and six with count four.

*State v. Wilcox*, 2006 WL 3743828 (Ohio App. 10th Dist. December 21, 2006). Petitioner filed a timely appeal in which he asserted the following assignments of error:

> I. IT WAS ERROR FOR THE COURT NOT TO GIVE A JURY INSTRUCTION ON THE LESSER INCLUDED OFFENSE OF MURDER AS REQUESTED BY COUNSEL FOR DEFENSE.
>
> II. THE GUILTY FINDINGS BY THE JURY WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> III. IT WAS ERROR FOR THE COURT TO DENY THE MOTION TO SUPPRESS STATEMENTS MADE BY APPELLANT IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS.
>
> IV. IT WAS ERROR FOR THE LOWER COURT TO PERMIT THE DNA EVIDENCE AND TESTIMONY AS THE DNA WAS OBTAINED IN VIOLATION OF APPELLANT'S CONSTITUTIONAL RIGHTS AND WAS UNRELIABLE.

*See id.* On December 21, 2006, the appellate court affirmed the judgment of the trial court. *Id.* Petitioner did not file a timely appeal of the appellate court's decision to the Ohio Supreme Court. Instead, on March 14, 2007, he filed a motion for delayed appeal pursuant to Ohio Supreme Court Rule of Practice II, Section 2(a)(4)(a). *Exhibit 7 to Return of Writ*. On May 2, 2007, the Ohio Supreme Court denied petitioner's motion for delayed appeal. *State v. Wilcox*, 113 Ohio St.3d 1486 (2007). On April 10, 2008, petitioner filed the instant *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. He executed the petition on April 6, 2008. He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

> 1. It was error for the court not to give a jury instruction on a lesser included offense of murder as requested by counsel for appellant.
>
> 2. The guilty findings by the jury were against the manifest weight of the evidence.
>
> 3. It was error for the court to deny the motion to suppress statements made by appellant in violation of his constitutional rights.
>
> 4. It was error for the lower court to permit the DNA evidence and testimony as the DNA was obtained in violation of appellant's constitutional rights and was unreliable.
>
> 5. Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.
>
> 6. Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

7. Conviction obtained by a violation of the privilege against self incrimination.

8. Denial of effective assistance of trial counsel.

9. Conviction obtained by use of perjured testimony and irreparable impermissible witness identification.

It is the position of the respondent that this action is barred by the one-year statute of limitations under 28 U.S.C. §2244(d), and alternatively, that petitioner's claims are procedurally defaulted.

## STATUTE OF LIMITATIONS

The Antiterrorism and Effective Death Penalty Act of 1996 imposed a one-year statute of limitations on the filing of federal habeas corpus petitions. 28 U.S.C. §2244(d) provides:

> (1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of–
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

Petitioner's conviction became final on February 5, 2007, forty-five days after the Ohio Tenth District Court of Appeals' December 21, 2006, dismissal of his appeal, and when the time period expired to file a timely appeal to the Ohio Supreme Court. See *Searcy v. Carter,* 246 F.3d 515, 518-19 (6th Cir.2001); Ohio Supreme Court Rule of Practice II, Section 2(A)(1)(a). The statute of limitations ran for 36 days, until March 14, 2007, when petitioner filed his motion for delayed appeal. Such action tolled the running of the statute of limitations until May 2, 2007, when the Ohio Supreme Court denied petitioner's motion for delayed appeal. *Lawrence v. Florida*, 549 U.S. 327 (2007). The statute of limitations expired 329 days later, on March 26, 2008. Petitioner waited until April 6, 2008, to execute the instant habeas corpus petition. Further, he has failed to allege any extraordinary circumstances that would justify equitable tolling of the statute of limitations. *See King v. Bell,* 378 F.3d 550, 553 (6th Cir.2004) (citations omitted).

Petitioner contends that the statute of limitations was tolled an additional ninety

days from the Ohio Supreme Court's May 2, 2007, denial of his motion for delayed appeal, *i.e.*, the time within which he could have pursued a petition for a writ of *certiorari* in the United States Supreme Court. *See Traverse*. However, this argument is foreclosed by the United States Supreme Court's decision in *Lawrence v. Florida, supra*. *See Bustillo-Gonzalez v. Eberlin,* 2009 WL 414668 (N.D. Ohio January 8, 2009).

For all of the foregoing reasons, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED** as time-barred under 28 U.S.C. §2244(d).

If any party objects to this *Report and Recommendation*, that party may, within ten (10) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C.§ 636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

s/Mark R. Abel
United States Magistrate Judge